# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 24-2462

DANIEL LEWIS, a/k/a Naseer Shakur,
Appellant

v.

SUPERINTENDENT, PHOENIX SCI;
THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA;
THE ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA

_____

On Appeal from the U.S. District Court, E.D. Pa.
Judge Jeffrey L. Schmehl, No. 2:18-cv-01576

Before: RESTREPO, BIBAS, and FISHER, *Circuit Judges*
Argued: Apr. 20, 2026; Filed: July 2, 2026
_____

NONPRECEDENTIAL OPINION[*]

BIBAS, *Circuit Judge*. Though it is easy to nitpick a cold record, it is far harder to find errors so significant that they violate the Constitution and prejudice a defendant. Daniel Lewis claims that his defense lawyer's errors undermine the jury's verdict. We agree that his lawyer should have objected to the trial court's reasonable-doubt instruction. But neither that error, nor the failure to move for recusal, prejudiced him. So we will AFFIRM the denial of his federal habeas petition.

## I. LEWIS IS CONVICTED OF FIRST-DEGREE MURDER

Late one night, Steven "Blast" Bates was murdered at a Kensington, Philadelphia, row-house. Someone shot him in the back twice with a revolver. Daniel Lewis was prosecuted in

state court for murdering Blast. At his first trial, the jury hung. But a second jury convicted him of first-degree murder.

At trial, three sources of evidence pointed to Lewis as the shooter: two witnesses plus his own statement to police. The first witness, Athena Ford, lived in the house where Blast was shot. She testified that when he was shot, she was standing outside. Lewis hurried past her into the house. A few minutes later, she heard gunshots. Then Lewis hurried out of the house past her, carrying a gun. Blast staggered outside and collapsed in front of the house.

The second witness, Daniel Miller, lived in the same neighborhood. He testified that he and several others were standing on a street corner a block from where Blast was shot. Miller saw Lewis run past, carrying a silver revolver and telling the group on the corner to "get out of here." JA 380. A few minutes later, Miller saw Lewis run back the way he had come, gun still in hand.

In addition to the two eyewitnesses, three police witnesses testified to Lewis's own statements. Several weeks after Blast was killed, Lewis himself was shot. While recovering in the hospital, he spoke to police, saying he had been shot by "the Richard Allen boys," who were trying to push him off the block that he had long worked. JA 352 (police officer's testimony). According to a police officer, when Lewis was asked about Blast's death, he said "that he went up to the second floor of [the rowhouse] and they started shooting at him so he did what he had to do." JA 353 (same).

In addition to that police officer, a police detective also testified that Lewis had told him about "the Richard Allen boys," who had "been trying to push him out" and had shot at and

2

robbed him. JA 434. Lewis said that Blast was part of that gang. According to this detective, when asked about the day when Blast was killed, Lewis said:

> Blast had a gun or pulled a gun on him and he had a gun too but he never pulled his. He said all right. He walked away and then he came back. When he came back, he went into [the house], went upstairs, and he said "They shot at me first so I did what I had to do." He then ran out of there.

JA 434.

Like the other officers, a second police detective testified that Lewis had talked about "problems with [the] Richard Allen boys." JA 414. As for the day when Blast died, the second detective recalled hearing Lewis say:

> [H]e had approached Blast and they had a conversation, and he had said that Blast was going to shoot him and he … had his gun on him and he just walked away, and then he came back a little later and went into this house where Blast was at and … that Blast was going to shoot him and so he took care of business.

*Id.*

The jury was instructed on first- and third-degree murder, voluntary manslaughter, and self-defense. Soon after retiring, the jury asked the judge to explain again the difference between first- and third-degree murder. And soon after the court clarified that distinction, the jury convicted Lewis of first-degree murder.

Lewis's conviction was affirmed on direct appeal, and his state Post Conviction Relief Act petition failed. Then he filed this first federal habeas petition. The District Court dismissed all claims without holding an evidentiary hearing. We granted a certificate of appealability on two Sixth Amendment claims of ineffective assistance of counsel. (Though Lewis procedurally defaulted those claims by not exhausting them on state post-conviction review, the government failed to invoke that exhaustion bar, and we need not address it. *Bennett v.*

3

*Superintendent Graterford SCI*, 886 F.3d 268, 281 n.11 (3d Cir. 2018).) We review de novo. *Id.* at 281. We appointed Adrian Roe of Duquesne Law School to brief and argue the case for Lewis. We thank him and his law students Kelsie Gorman and Luke Baughman, both of whom argued the case, for their able service to our Court.

## II. THOUGH COUNSEL FAILED TO OBJECT TO THE REASONABLE-DOUBT INSTRUCTION, LEWIS WAS NOT PREJUDICED

Lewis first argues that his lawyer should have objected to the trial judge's instruction on reasonable doubt. The government forthrightly admits that the instruction was improper.

To illustrate reasonable doubt, Judge Renée Cardwell Hughes offered an extended hypothetical. She asked jurors to imagine that a loved one had a "life-threatening medical condition" for which "the only protocol … was an experimental surgery." JA 545. Choosing to "go forward with the surgery" meant "mov[ing] beyond reasonable doubt." *Id.*

This instruction misframed the jury's alternatives as death of a loved one through inaction (acquittal) or the slightest chance of survival through action (conviction). And that framing substantially lowered the government's burden of proof—or even shifted it to Lewis by suggesting that he needed to give a strong reason to acquit. That was error. *Cage v. Louisiana*, 498 U.S. 39, 41 (1990) (per curiam). So was steering jurors toward acting based on subjective emotion, not objective reason. *See United States v. Hernandez*, 176 F.3d 719, 728–32 (3d Cir. 1999); *United States v. Polan*, 970 F.2d 1280, 1286 (3d Cir. 1992) (Alito, J.).

Granted, the surrounding instructions correctly stated the law. Even so, the jury was reasonably likely to have applied this contradictory instruction incorrectly, especially since the

erroneous hypothetical was lengthy and tugged on the heartstrings. *See Hernandez*, 176 F.3d at 731–35; *United States v. Pinkney*, 551 F.2d 1241, 1245 (D.C. Cir. 1976).

Nonetheless, the evidence at trial was so strong that counsel's failure to object made no difference to the trial's outcome. There is no reasonable probability, meaning one "sufficient to undermine confidence in the outcome," that a properly instructed jury would have acquitted Lewis, convicted him only on a lesser charge, or hung. *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984) (requiring not only deficient performance, but also this measure of prejudice to the trial's outcome). Thus, we will affirm. *Baxter v. Superintendent Coal Twp. SCI*, 998 F.3d 542, 548–49 (3d Cir. 2021) (applying *Strickland*'s prejudice prong to counsel's failure to object to defective reasonable-doubt instruction).

For first-degree murder, the prosecution needed to prove both that Lewis had killed Blast and that he had done so with the specific intent to kill. Ford's testimony helped prove the killing but not specific intent. Miller's testimony supported both points. But most damning for Lewis was his own statement to police that "[he] did what [he] had to do" or "took care of business." JA 353, 414 (first quotation), 434 (second one). From those statements, the jury could find beyond a reasonable doubt both the killing and specific intent to kill.

To be sure, there is some ambiguity about whether Blast was, at that very moment, planning to shoot Lewis. And although counsel did not press the point at trial, this ambiguity was enough to get Lewis a jury instruction on self-defense. Yet the rest of the statement supports specific intent: Blast and the Richard Allen boys were poaching Lewis's drug-dealing business and had physically threatened him before, so Lewis acted to protect his territory and preempt a future attempt on his life. So does the physical evidence: Blast was shot in the

back, twice. On these facts, claiming recklessness or self-defense required sheer speculation. That speculation is not enough to undermine confidence in the verdict.

Lewis protests that the witnesses against him were not credible. True, the jury heard many reasons to doubt Ford and Miller. But it also heard reasons to believe them. More importantly, the jury could have readily found Lewis's own statements voluntary. And these statements, by themselves, were compelling—more than enough to satisfy the prosecution's burden.

It makes no difference that the jury debated the difference between first- and third-degree murder. Nor does the prior hung jury sway us. There was more evidence the second time around. Ford testified in person only at the second trial, and the second jury heard more evidence that bolstered the witnesses' and detectives' credibility. Plus, the ultimate question is the same: Has Lewis shown a reasonable probability that the second jury, if properly instructed, would have had a reasonable doubt about his guilt? After reviewing the full record, we conclude that he has not met this burden.

### III. COUNSEL'S FAILURE TO MOVE FOR RECUSAL WAS NOT INEFFECTIVE

Second, Lewis claims that Judge Hughes's comments at trial showed an appearance of bias or impropriety and should have led his lawyer to move for her to recuse. But his claim fails both prongs of *Strickland*. Though his lawyer failed to object, that failure was not deficient performance. And even if it were, Lewis suffered no prejudice as a result.

#### A. Lewis cannot show that there was a reasonable basis for a recusal motion

Under the Due Process Clause, a judge must recuse herself whenever she might be biased based on her personal interest in or connection to a case. *Williams v. Pennsylvania*, 579 U.S. 1, 8–9 (2016). Pennsylvania law goes further, requiring a judge to recuse when she cannot

act impartially or her "continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary." *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 89 (Pa. 1998). Lewis's arguments do not fit the due-process mold. But any differences between the theories are immaterial. The comments were made outside the jury's presence. And reading them in the context of the whole record, Lewis does not show even a reasonable basis to move to recuse.

*1. Statements about the trial record.* Lewis argues that two of the judge's comments to the court reporter show that she tried to alter the trial transcript and impair his right to appeal. First, after saying "Bull. Bull." to defense counsel, Judge Hughes said, "take the 'bull' out of my record, please. I'm already in enough trouble with the appellate courts." JA 326. Similarly, after saying "I will kill you" to the prosecutor and defense counsel, Judge Hughes said, "take that out of the record." JA 505.

To start, both comments to counsel look intemperate. But in the context of this long, contentious trial—where counsel re-argued resolved issues, were curt with each other, and often needed sidebars—they were not grounds for a recusal motion. *Abu-Jamal*, 720 A.2d at 89–90.

The record-related comments could be more troubling. Trial transcripts are key to appellate review. So altering them would "strike at the very pillars of meaningful appellate review, and … the basic tenets of due process." *Commonwealth v. Dougherty*, 18 A.3d 1095, 1096 (Pa. 2017) (Baer, J., concurring). We assume that any alteration (or serious attempt to alter them) would warrant a recusal motion. *See id.* Even so, the comments are no basis for recusal here, for two reasons. First, unlike in *Dougherty*, the judge's comments about altering the

7

record were themselves made on the record, one involved both lawyers, and neither was about a comment made to Lewis. *See id.* There is no evidence that any part of the transcript was altered, even temporarily. *See id.* And we are limited to the existing record. *See Shinn v. Ramirez*, 596 U.S. 366, 371 (2022).

Second, there is no evidence of a genuine effort to alter the record. The judge made many other informal, familiar, off-the-cuff statements. If everyone understood the comments about the record as jokes, or asides reflecting regret for a casual comment, Lewis would have no ground for recusal. The record does not suggest that anyone was to take them literally.

*2. Statements about Lewis.* Judge Hughes also made several intemperate comments about Lewis. Near the end of trial, the prosecution asked to put on evidence of two writings found in Lewis's cell. One was a letter, written by a third party, relaying an attempt to intimidate Miller. The other was a writing entitled "All Rats Must Die." JA 478. In it, the main character (seemingly Lewis) fantasized about torturing a witness (seemingly Miller) for testifying against him. During a hearing about admitting these writings, Judge Hughes called Lewis a "flipping psychopath" and "sick human being." JA 481, 482.

Given the content of the "All Rats" writing, this emotionally charged outburst does not justify a recusal motion for bias or impropriety. *See Dougherty*, 18 A.3d at 1096 (Baer, J., concurring); *Abu-Jamal*, 720 A.2d at 89–90. And in the same breath, Judge Hughes reminded the prosecution that it could not simply put on evidence that Lewis was a bad person. She then held the prosecution to its burden, precluding most of what it wanted to present. In context, these comments gave Lewis's counsel no basis for a recusal motion: They did not reflect "deep-seated … antagonism," and Judge Hughes kept ruling in accordance with the

8

law. *Commonwealth v. Druce*, 848 A.2d 104, 109–10 & n.3 (Pa. 2004) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). So counsel properly did not move for recusal.

**B. Lewis has not shown prejudice either**

Even if counsel had performed deficiently, it would not matter, as Lewis has not shown prejudice. He does not argue that any error was structural, nor does he discuss how to analyze prejudice from such a structural error. Instead, he presumes the ordinary prejudice analysis of *Strickland*. Under that standard, he fails.

First, he points to no rulings that he says were unfair, let alone rulings that would have been decided differently absent the appearance of bias that *also* had a reasonable chance of affecting the outcome. That dooms his claim. *See Johnson v. Tennis*, 549 F.3d 296, 303 (3d Cir. 2008) (refusing to find ineffective assistance when a successful recusal motion would have been "fruitless"). Lewis also offers no support for the idea that retrial before a different judge, alone, creates a reasonable likelihood that the second jury would not have convicted. And though he speculates that the jury may have perceived Judge Hughes's tone or demeanor towards Lewis as hostile, he acknowledges that the record does not support that argument. Mere speculation is not enough.

\* \* \* \* \*

Though Lewis's counsel should have objected to the flawed reasonable-doubt instruction, Lewis suffered no prejudice. And he has not shown how his counsel's failure to move for recusal was either deficient performance or prejudicial. So we will AFFIRM the District Court's denial of his habeas petition.

9

*Counsel for Appellant*

Kelsie Gorman                    [Argued]
Luke Baughman                [Argued]
Adrian N. Roe
DUQUESNE UNIVERSITY SCHOOL OF LAW


*Counsel for Appellees*

Emily R. Horwitz              [Argued]
Katherine E. Ernst
Peter F. Andrews
PHILADELPHIA COUNTY DISTRICT ATTORNEY'S OFFICE